UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MOROSS LIMITED PARTNERSHIP,

    Plaintiff,

vs.                                                        Case No. 01-74307

FLECKENSTEIN CAPITAL, INC.,                    HON. AVERN COHN
WILLIAM FLECKENSEIN, and RTM
FUND, L.P.,

    Defendants.
_____/

**MEMORANDUM AND ORDER
GRANTING DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT
AND
DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**[1]

I.  Introduction

This is a securities fraud case. Plaintiff Moross Limited Partnership (Moross) is suing defendants, Fleckenstein Capital, Inc. (Fleckenstein Capital), the RTM Fund, L.P. (the RTM Fund) and William Fleckenstein (Fleckenstein) claiming that defendants committed fraud in connection with certain investments of Moross with defendants. Moross claims: (1) violation of Michigan's Uniform Securities Act, (2) accounting, (3) common law fraud, and (4) breach of fiduciary duty. Moross seeks compensatory and exemplary damages. Essentially, Moross says that defendants carried out a scheme, which it calls "cherry-picking," by which "winning trades" were assigned to

---

[1]The Court originally scheduled this matter for hearing. Upon review of the parties' papers, however, the Court finds that oral argument is not necessary. See E.D. Mich. LR 7.1(e)(2).

Fleckenstein's personal account (the Fleckenstein Account) while "losing trades" were assigned to the RTM Fund.

Before the Court is defendants' renewed motion for summary judgment[2] on the grounds that there is insufficient evidence to require Moross' claims to go to trial. Also before the Court is Moross' cross motion for partial summary judgment on his "misrepresentation claim." For the reasons which follow, defendants' motion will be granted and Moross' motion will be denied. Simply put, Moross have been afforded every indulgence to make out a case for trial and based on the record as it now stands, it has failed to produce sufficient evidence of its claims to allow the case to go to a trier of fact.

## II. Background

### A. Substantive

#### 1.

The material facts, as gleaned from the parties' papers follow:

RTM is a Delaware limited partnership that invests in publically traded securities

---

[2] Previously, defendants filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 9(b) on the grounds that Moross has failed to properly plead the elements of its claims and is not entitled to exemplary damages. The motion was granted in part and denied in part. See Memorandum and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, filed July 1, 2002.
   In April 2003, defendants filed a motion for summary judgment. On June 18, 2003, defendants filed a motion for sanctions under Fed. R. Civ. P. 11 and 28 U.S.C. § 1927 on the grounds that Moross "did not have an evidentiary basis" for its claims. On July 21, 2004, the Court denied the motion for sanctions and denied the summary judgment motion without prejudice.

with "accredited investors."[3]  Fleckenstein Capital is a Washington corporation that acts as RTM's general partner.  Fleckenstein is the sole shareholder in Fleckenstein Capital as well as the investment manager and primary trader for RTM.

On December 1, 1996, Stanley Dickson, an attorney, received a solicitation from Fleckenstein to invest in the RTM Fund, a fund established by RTM.  Included in the solicitation was a Confidential Private Offering Memorandum (Offering Memorandum).  Relevant portions of the Offering Memorandum are set forth below.

In December 1996, Moross was established as a Michigan limited partnership.  Pacesetter Management, Inc. is the sole general partner in Moross and Windmill Trust is the sole limited partner.  Dickson is the sole shareholder and only officer of Pacesetter Management, Inc.

In April 1997, Moross and Fleckenstein Capital established the Moross Fund, L.L.C., (the Moross Fund) a Delaware limited liability company, which was to be funded by Moross which in turn invested in the RTM Fund.  The Moross Fund was also managed by Fleckenstein.

In November 1997, Dickson invested $500,000 in the Moross Fund.  Dickson later invested $250,000 more.  As of 1998, the Moross investment totaled $750,000.00.  In 1998, Moross closed its individual separate managed account and became a limited partner in RTM.

Fleckenstein personally and his family members (his mother and a sister) also

---

[3]Under SEC Rule 501, an "accredited investor" is generally defined as an individual with a net worth of $1,000,000 and an entity with assets of $5,000,000.00 that was not formed for the purpose of investing in the Fund.

invested $1,100,638 in the RTM Fund.

The investment strategy of the RTM Fund, as described in the Offering Memorandum was to "sell short." This strategy is based on the assumption that certain stocks are overvalued and as a result, may decline in value. The RTM Fund would sell short by borrowing stocks and later repurchasing them in the open market hopefully when the price had dropped, thereby making a profit.

2.

In addition to the Offering Memorandum, Moross received a Partnership Agreement and a Subscription Agreement. Relevant parts of these documents follow.

Section 13 of the Offering Memorandum provides:

> The General Partner and its affiliates may manage accounts other than the Fund and will be required to devote time to the management of those accounts.

Section 3.1 of the Partnership Agreement states in part:

> ... Nothing herein shall prevent the General Partner or any affiliate from conducting any other business. The General Partner or any affiliate may act as investment advisor or manager for others, may manage funds or capital for others, may have, make and maintain investments in its own name or through other entities, and may serve as consultant, partner or stockholder of one or more investment funds, partnerships, or advisory firms.

Section 3.3 of the Partnership Agreement provides in part:

> The General Partner and its partners, officers, directors, stockholders, employees, agents and controlling persons (collectively, the "Affiliates") shall have no liability to the Fund or any Limited Partner for any loss suffered by them which arises out of any action or inaction of the General Partner as general partner of the Fund if the action or inaction was taken in the best interest of the Fund and did not constitute gross negligence of the General Partner or the Affiliates.

The Offering Memorandum states how net profits and net losses are allocated

among limited partners of the RTM Fund.  Section 7 states in part:

> Except for the incentive allocation to the General Partner (Mr. Fleckenstein in his capacity as a special limited partner) described below, the increase or decrease for any fiscal period in the Fund's Net Assets is allocated to each Partner in the proportion that his capital account in the Fund as of the beginning of the period bore to the total of all the capital accounts as of that date.  The Fund's Net Assets are its total assets minus total liabilities, computed according to generally accepted accounting principles, including unrealized gains and losses on the Fund's securities positions.  In general, Net Assets are increased by Fund income (e.g. dividends) and capital gains (both realized and unrealized) from trading, and reduced by expenses (e.g. management fee) and capital-losses (realized and unrealized).
>    The value of a Partner's capital account is equal to his capital contribution to the Fund; increased by his allocable share of any increase in Net Assets as noted above, and reduced by his allocable share of any decrease in Net Assets and any capital withdrawn by the Partner form his account or distribution made by the Fund to the Partner from his account.

Section 8.1 of the Partnership Agreement describes the allocation of net profits and losses.  It states in part:

> For each capital contribution made by a Partner, whether an initial capital contribution or contribution made after his admission, a sub-capital account (the "account") shall be established for the Partner.  The Account shall be credited with the amount of the Partner's capital contribution and his share of any increase in Net Assets, as provided below.  The Account shall be reduced by withdrawals from the Account as provided in § 8.2 below, and by the Partner's share of any decrease in Net Assets as provided in § 8.1(b) below.  The sum of all of a Partner's Account shall constitute his "Capital Account."

3.

The selling short investment strategy proved to be unprofitable during the bull market of 1998-2000 and the RTM Fund suffered significant losses.  Due to the extensive losses Moross experienced over the 2 years, in April 2000, Dickson requested print outs in the form of spreadsheets from RTM's broker providing daily totals of RTM's profits and losses.  From these spreadsheets, Dickson, in the complaint, says he

discovered that when trades conducted with Moross assets earned profits, Fleckenstein assigned these profits to his own personal account (the Fleckenstein Account) and any losses were assigned to other investors, including Moross. For example, Dickson discovered that the RTM Fund had a loss of about 45% year to date whereas the Fleckenstein Account had a gain of about 6% year to date.

In April 2000, Dickson telephoned Fleckenstein to inquire about the distributions. Dickson says that Fleckenstein admitted his wrongdoing and advised that he would refund Moross' initial investment. However no refunds was made.

Sometime later in April, Fleckenstein advised Dickson that he had disgorged $221,500 from the Fleckenstein Account to the RTM Fund and applied these monies to the accounts of other investors in accordance to their share and as set forth in the Partnership Agreement. Approximately $2,000 was applied to Moross' account.

Moross later withdrew from the RTM Fund and received an additional $75,000.

### B. Procedural

On November 9, 2001, Moross filed its complaint against defendants.

In April 2002, defendants filed a motion to dismiss for failure to state a claim upon which relief could be granted and for failure to plead the fraud claim with particularity. On July 1, 2002, the Court granted the motion in part and dismissed Moross' claim for exemplarary damages. As to Moross' fraud claims, the Court acknowledged that the allegations were "sparse" but sufficient to withstand a motion to dismiss. The Court explained:

> Moross argues that its complaint explains the fraud with particularity in that it alleges that Fleckenstein essentially employed a trading activity known as "cherry-picking" in which Fleckenstein would at the end of a trading day allocate

> winning trades to his own account and losing trades to the RTM Fund.  While defendants argue that Moross should provide details proving these charges, Moross is unable to do so without discovery.
> ...
>     ...As Moross explains in its response, it has alleged a "cherry-picking" scheme by Fleckenstein in contravention to the terms of the Offering Memorandum.

Order at p. 6.

During discovery, defendants asked Moross repeatedly to identify any cherry picked trades or the profits Moross lost from such cherry-picking.  Moross simply referred defendants to the "Valuation Analysis Reports provided to Plaintiff by ING Barings, LLC between January 2002 and April 2002 that reveal the disparity in trading results - "losing trades" assigned to RTM Fund, while "winners" assigned to William Fleckenstein's personally managed accounts."

In light of the perceived lack of evidence proffered by Moross, on April 1, 2003, Defendants filed a motion for summary judgment as well as a motion for sanctions.  Moross responded, contending that it needed additional time to provide evidence of its claims, i.e. evidence of cherry-picking, with the completion of an expert report.  Counsel for Moross also explained that it had been only recently retained.  A hearing was held on July 28, 2003, at which time the Court gave Moross 45 days in which to serve on defendants a "detailed comprehensive document which forms the foundation for your case."  Moross was to have 30 days thereafter "to give [defendants] any expert analysis" of the report.  At the end of the 75 days, it was intended that defendants would have Moross' "complete case in hand."  Implicit in the Court's ruling was that defendants' motion for summary judgment was taken under advisement, with

defendants having an opportunity to supplement their motion following receipt of the evidence from Moross. The Court also observed that Moross was "not even close" to producing the evidence required to support its cherry-picking claim, but nevertheless was given an opportunity to make out a case.

Moross did not file papers in the form required by the Court. However, following an extension, on October 14, 2003, Moross filed an "Expert Report and Exhibits in Opposition to Defendants' Motion for Summary Judgment." The expert report was from Moross' then-identified expert, Paul Moulden, who submitted a four page letter report opining that Fleckenstein had assigned more "losing trades" to the RTM Fund and more "winning trades" to his personal accounts. Moulden identified some of these trades. On December 1, 2003, defendants filed a response to the expert report styled "Declaration of William A. Fleckenstein in Further Support of Motion for Summary Judgment, in which Fleckenstein challenges Moulden's analysis and conclusions. Defendants also filed two supplemental papers in support of the motion for sanctions following the July hearing.

The motion for summary judgment and motion for sanctions were set for hearing on April 14, 2004. After several adjournments at the parties' request, the motions were heard on July 21, 2004. In the interim, Moross filed a more complete expert report from Paul Moulden. The Court denied defendants' motions at the hearing. Noting not only that the record was so voluminous that summary judgment could be denied for administrative convenience, the Court also noted that Moulden's report appeared to carry Moross pass the threshold of summary judgment. In another attempt to impel Moross to flesh out his claims, the Court ordered Moross file a detailed pre-trial

statement with proposed findings of fact. This was done in part due to the fact that Moross retained new counsel, who also requested additional discovery. Importantly, the Court denied defendants' summary judgment motion without prejudice, implicitly, if not explicitly, indicating that defendants could renew the motion at any later appropriate time following the final close of discovery.

Shortly after the hearing, Moross' new counsel withdrew. At some point thereafter, Moross retained its original counsel.

On February 11, 2005, defendants filed the instant renewed motion for summary judgment again on the grounds that Moross has no evidence of cherry-picking. Defendants' motion is based on Dickson's and Moulden's depositions, as well as additional evidence discussed below.

On March 21, 2005, Moross filed a response and a cross-motion for partial summary judgment on the grounds. Moross argues that there are genuine issues of material fact as to the cherry-picking claims. He also says that it is entitled to summary judgment on the "misrepresentation" claims, the substance of which is discussed below.

### III. Legal Standard

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving

party's response "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50. Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings. Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52). The Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson, 477 U.S. at 255. Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted. Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

IV. Defendants' Motion for Summary Judgment

A. Cherry-picking Claim

1.

Defendants say that it has made clear by the depositions of Dickson and Moulden, Moross has no evidence to support its claim of cherry-picking. As to Dickson, he admitted that he did not find any cherry-picked trades when reviewing the trading records. As to Moulden, he admitted that his report is incomplete in many respects. Defendants also go in detail to explain the flaws in Moulden's report.

Moross' response to defendants' well-orchestrated attack on Moross' claim is, to say the least, thin. Moross devotes only one paragraph in its 24 page brief to this claim, stating:

> As described above, the claim relating to cherry-picking is the subject of the report submitted by Plaintiff's expert [Moulden]. While defendants contend that the Court should ignore the report in view of the subsequent deposition testimony, Plaintiff submits that fact issues persist. Accordingly, the Court should preserve this claim for bench trial or evidentiary hearing to allow Mr. Moulden to testify.

Moross' brief at p. 22.

2.

Defendants' arguments are well-taken. While up to this point the Court had given Moross every indulgence in letting its cherry-picking claim to go forward, the time has come for it to end. The Court's initial denial of summary judgment was based, in part, on Moulden's expert report, which defendants had not seriously attacked until the filing of their renewed motion and until after taking Moulden's deposition. As defendants point out, Moulden's opinion is seriously flawed. Moulden testified at deposition that he only reviewed a fraction of all of the daily the trading records - only one quarter of the eight quarters Moross invested in the RTM Fund. For that single quarter, he only

analyzed 1/3 of the trades. Moulden admitted he looked at approximately 4% of all the trading records available in order to draw his conclusions. In response to why he did not look at more data, he replied he did not know. Moulden also admitted that for many of the trades he did review, the records were incomplete and he was forced to rely on the descriptions of some of the trades to draw his conclusions, including what prices the various trades had opened. Moulden admitted he guessed as to whether the trades, when completed, were profitable or unprofitable. See Moulden dep. at p. 80-83. Moulden also performed his analysis using trades from three separate fund accounts - the RTM Fund, the RTM B account, and the RTM Overseas account - as if they were one fund. Moross was an invested only in the RTM Fund. See id. at 137. Finally, Moulden testified that the actual profit or loss for a trade was "irrelevant" to his analysis, but was based on a concept of "theoretical" profits and losses. Moross' response brief addresses none of these flaws or Moulden's deposition testimony. It is not enough to overcome summary judgment by broadly asserted that Moulden's opinion creates a genuine issue of material fact.

In a supplemental filing, defendants advised the Court that Moross had asked the State of Washington Department of Financial Institutions, Securities Division (Securities Division) to investigate Moross' complaint against defendants.[4] Moross apparently provided Moulden's report to the Securities Division. The Securities Division, by a letter dated April 12, 2005, which defendants only recently became aware, concluded:

---

[4] At Dickson's deposition on November 23, 2004, Dickson stated that his law firm requested an investigation by the Securities Division as to his claims and that the investigation was ongoing as of November 2004.

> This responds to your letter of February 28, 2005 concerning the complaint of your client Moross against Fleckenstein Capital, Inc. When we spoke by telephone on March 10, 2005, I explained that I had arranged to have our field examiner review the report of your expert on allocation issues. Our field examined has reviewed the report and done additional field work on the allocation question.
>
> As I told you over the telephone, in order to make a case that improper allocations have been made, we need to be able to establish that the allocations were made afer it was known which trades had made money and which had lost money. The report of your expert does not address timing of the allocation of the trades. Our field examiner also found no evidence that trades were allocated to accounts after it was known which trades had been profitable. We therefore do not have the evidence we would need to bring an action against advisor for improper allocation of trades.

See Exhibit A to defendants' Supplemental Affidavit of M. William Munno. The Securities Division closed its file for this, and other reasons. Thus, Moulden's opinion is simply not sufficient to create a genuine issue of material fact as to cherry-picking.

The same is true from the deposition of Dickson, which Moross fails to address in its response. Dickson testified at deposition that he did not personally discover any alleged improper allocations. He stated he could not remember making any such discoveries, that he was not "capable" of doing so because of the effort involved. Dickson dep. at p. 56-57. In short, he admitted he could find no evidence of cherry-picking based on the evidence he examined. These statements are wholly contrary to the allegations in the complaint which states that Dickson reviewed spreadsheets and determined that trades were being improperly allocated. See Complaint at ¶ 15. This leaves Moross with only the opinion of Moulden which, as explained above, is not sufficient to take the case to trial.

Also significant is the fact that Moross has failed to provide a cogent damage calculation of any kind. Moulden admitted he had not performed any damage

calculations and has no opinion on whether Moross suffered any damages. Moulden dep. at p. 187, 188, 194. Moross' response says nothing about its failure in this regard. This fact also points in favor of granting the motion for summary judgment.

### B.  Pan American Silver Corporation Claim

In its response to defendants' initial summary judgment motion, Moross for the first time claimed that defendants failed to disclose that Fleckenstein was a director of Pan American Silver Corporation and that Moross was harmed as a result. As defendants point out, Moross has never asked to amend his complaint to include this claim. Defendants also note that any such claim would be time-barred as a claim for breach of fiduciary duty is subject to a three year statute of limitations. See M.C.L. § 600.5805(8).

Moross concedes that the complaint does not make such a claim, but responds that defendants have been aware of the claim and any amendment allowed at this time would relate back to the date of the original filed complaint.

This claim is the subject of Moross' cross motion for partial summary judgment, discussed below.

### C.  Equitable Accounting Claim

Defendants say they are entitled to summary judgment on Moross' equitable accounting claim because they have long since produced all of the trading records for the entire period Moross was an investor in the RTM Fund. Moross has also reviewed accounting records from Ernst & Young for the RTM Fund. There is nothing more defendants can provide.

In response, Moross simply alleges that "[h]ere, Plaintiff to date remains unable

to determine the basis for the limited credit previously provided by Defendants." Moross, however, fails to articulate what additional information it needs for its equitable accounting claim. Under these circumstances, defendants are entitled to summary judgment on the claim.

### V. Moross' Cross Motion for Partial Summary Judgment

Moross moves for partial summary judgment on its claim that Fleckenstein misrepresented and/or breached his fiduciary duties by failing to disclose his involvement in Pan American Silver Corporation. Moross' cross motion is contained in its response to defendants' motion for summary judgment and does not comply with the Court's motion practice guidelines. In addition, Moross devotes the vast majority of his brief to this claim, adding only one paragraph discussion for its cherry-picking claim. Moross also refers repeatedly to a 1996 Form ADV. He does not identify or explain the source of the form, nor was the form part of the initial offering materials or ever before referred to in the many prior filings in this case. According to defendants, a Form ADV is a document that the SEC requires of investment advisors who are registered with the Commission.

Moross says that Fleckenstein's failure to disclose his relationship with Pan American Silver on the Form ADV constitutes a misrepresentation and breach of fiduciary duty. This has now become Moross' primary claim against defendants - misrepresentation during the offering process.

Defendants are correct that Moross' eleventh-hour newly-minted claim cannot survive summary judgment. Putting aside defendants' arguments that this claim is barred by Moross' failure to plead it within the statute of limitations, the claim itself lacks

15

merit based on the record. Fleckenstein did not disclose that he was a director in Pan American Silver on the 1996 Form ADV, however, Fleckenstein was not a director of Pan American Silver until the spring of 1997. Moreover, the Form ADV was not part of the offering submissions. Moross received the offering materials in December 1996, more than 5 months before Fleckenstein became a director in Pan American Silver. Thus, there can be no contention that defendants' failure to include this information in the offering materials constitutes a material omission. Moreover, the Form ADV itself shows that Fleckenstein disclosed his intention to buy or sell securities also recommended to clients. This statement is consistent with the offering materials which state that Fleckenstein may make investments in his own name. See RTM Partnership Agreement at § 3.1. Fleckenstein's intention to trade securities, both for his own account and for the RTM Fund, was clearly disclosed. Fleckenstein also sent Dickson a letter dated October 31, 1997 in which he specifically disclosed that he was a director in Pan American Silver. This was at least six months before Moross became a limited partner in the RTM Fund. Dickson does not deny receiving the letter, but testified at deposition that he could not recall seeing the letter. Dickson dep. at p. 121-123. Dickson's failure to recall receiving the letter, in light of the other evidence of Fleckenstein's disclosure, is not sufficient to survive summary judgment. In short, Moross has failed to produce evidence to create a genuine issue of material fact as to whether Fleckenstein misrepresented and/or breached his fiduciary duty with respect to his role with Pan American Silver.

## VI. Conclusion

In sum, Moross has not established a genuine issue of material fact relating to its

interaction with defendants which would allow for a trial in this case.  Moross filed its complaint in 2001.  In 2002, Moross' sparse allegations of cherry-picking to survived a motion to dismiss.  In 2003, the Court gave Moross an opportunity to flesh out its claims and evidence in light of defendants' motion for summary judgment.  In 2004, the Court again directed Moross to detail its claims.  Moross' responses and supporting evidence have been insufficient, as explained above.  Accordingly, defendants' motion is GRANTED.  Plaintiff's motion is DENIED.  This case is DISMISSED.

     SO ORDERED.

Dated:  July 19, 2005
                      s/Avern Cohn
                      AVERN COHN
                      UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was sent to counsel of record on this date, July 19, 2005, by electronic and/or ordinary mail.

                      s/Julie Owens
                      Case Manager, (313) 234-5160